UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHN BUCK, | : | CIVIL ACTION NO. |
|    Plaintiff, | : | 3:08-CV-1619 (JCH) |
| | : | |
| v. | : | |
| | : | |
| AT&T SERVICES, INC., | : | JUNE 25, 2010 |
|    Defendant. | : | |

**RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 38)**

Plaintiff, John Buck ("Buck"), has brought this action against his employer, defendant AT&T Services, Inc. ("AT&T"). In his Amended Complaint, Buck alleges violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a).[1] See Am. Comp. at ¶ 16 (Doc. No. 18). AT&T has moved for summary judgment. See Mot. for Summ. J. (Doc. No. 38). For the reasons that follow, AT&T's Motion is granted.

**I.   STANDARD OF REVIEW**

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009). Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Id. In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party

---

[1] Connecticut courts generally analyze ADA and CFEPA claims under the same standard. See, e.g., Ann Howard's Apricots Rest. v. Comm'n on Human Rights & Opportunities, 237 Conn. 209, 225-26 (1996). Therefore, this court will analyze Buck's claims together.

1

against whom summary judgment is sought.  See Fed R. Civ. P. 56(c); Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment."  United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009).  Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'"  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also Havey v. Homebound Mortgage, Inc., 547 F.3d 158, 163 (2d Cir. 2008) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

## II.    FACTS

Buck is a Senior Communications Specialist for AT&T, and he has been continuously employed by AT&T since 1986.  See L.R. 56(a)(1) Stmt. at ¶¶ 1, 3 (Doc. No. 40).[2]  He has never been laid off.  See id. at ¶ 2.  Buck's current salary is $87,094.

---

[2] For the purposes of this section, undisputed facts will be cited to AT&T's Local Rule 56(a)(1) Statement.  At times, Buck's Local Rule 56(a)(2) Statement "disagrees" with AT&T's 56(a)(1) Statement, but fails to cite to any admissible evidence. See, e.g., L.R. 56(a)(2) Stmt. at ¶ 76 (Doc. No. 51).  Buck's 56(a)(2) Statement also occasionally states that, "plaintiff lacks sufficient evidence to agree or disagree." See, e.g., id. at ¶ 52.  Finally, in some paragraphs, Buck "disagrees" with AT&T's statement and makes his own statement, but does not support that statement with a citation to admissible evidence. See, e.g., id. at ¶ 75.  Local Rule 56(a)(3) states that "failure to provide specific citations to the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence

See Pay stub of 1/21/10, Ex. 6 to Pl.'s L.R. 56(a)(2) Stmt. (Doc. No. 51).[3]  Between 1993 and 2006, Buck was a Network Technical Manager ("NTM"), which did not require him to use a computer for prolonged periods of time.  See L.R. 56(a)(1) Stmt. at ¶¶ 5-6, 9.  Buck's salary as an NTM was $82,000.  See id. at ¶ 14.  The NTM position was a "Level 2" position which qualified Buck for a bonus of at least thirteen percent of his salary.  See id. at ¶¶ 101-02.

On March 31, 2006, AT&T notified Buck that the company would be outsourcing their positions to India, with the exception of three NTM positions that would remain in the United States.  See id. at ¶ 10.  AT&T stated that none of the NTMs would be laid off, but that they would be permitted to search for a new job within the IT organization, and that they would be placed in the Resource Pool if they were unable to find a suitable position.  See id. at ¶¶ 11-12.  Buck expressed an interest in filling one of the three remaining NTM positions, but he was not selected.  See id. at ¶¶ 15-16.

On April 7, 2006, Buck sent an email to Elaine Arnotti, an employee relations manager, and John Szanyi, his manager, stating that due to an injury to his right eye, it was "very difficult to view a video monitor for any length of time."  L.R. 56(a)(1) Stmt. at ¶¶ 19-20; 4/7/06 Email from John Buck to Elaine Arnotti, Ex. B to Def.'s Mem. (Doc. No. 39).  In May 2006, Buck received an email from Deborah Luxton, the hiring manager for the Senior Systems Manager ("SSM") position, in which she stated that she had received his resume and was interviewing for a project management position.  See L.R.

---

admitted."  See L.R. 56(a)(3).  Buck's unsupported statements will be deemed admitted.

[3] The paystub shows a bimonthly payment of $3628.94, which calculates to a yearly salary of $87,094.

3

56(a)(1) Stmt. at ¶ 22; 5/11/06 Email Exchange Between John Buck and Deborah Luxton, Ex. D to Def.'s Mem.

Luxton informed Buck that he would have to learn software and infrastructure for the SSM position, and she interviewed Buck for the position over the phone. See L.R. 56(a)(1) Stmt. at ¶¶ 23, 25. Buck was uncertain of what his job duties would be in the SSM position. See id. at ¶¶ 24, 27-28. Buck did not disclose his eye injury to Luxton during the interview because he had disclosed it to Arnotti in April and believed that that information would be transmitted to any potential new supervisors. See L.R. 56(a)(2) Stmt. at ¶ 29.

Buck began working as an SSM in June 2006. See L.R. 56(a)(1) Stmt. at ¶ 30. His starting salary was $81,200. See L.R. 56(a)(2) Stmt. at ¶ 31. Soon after starting the SSM position, Buck discovered it required the "constant monitoring of multiple sessions screens" and that he was required to use the computer "all day long" to perform the essential functions of the position. See L.R. 56(a)(1) Stmt. at ¶¶ 32-37. After Buck started in the SSM position, he realized that his eye condition prevented him from performing the essential functions of the job. See id. at ¶ 38.

Buck applied for a job accommodation through the AT&T Integrated Disability Service Center ("IDSC"). See id. at ¶ 39. In response to a request for information from his medical provider regarding his eye injury, Buck provided AT&T with a letter dated August 1, 2006, from Dr. Scott M. Soloway, which stated that "any prolonged work in front of a visual display terminal would be quite difficult" for Buck. Id. at ¶¶ 41-44. In August 2006, an IDSC attempted to contact Dr. Soloway for clarification of his letter, but had trouble reaching him. See id. at ¶ 49. As of September 7, 2006, the only medical

4

document AT&T had from Dr. Soloway was the August 1 letter. See id. at ¶ 55.

AT&T referred Buck to its own physician, Dr. Barbara Parke, for review. See id. at ¶ 56. Dr. Parke proposed an accommodation for Buck providing that he only be required to view a computer screen for fifteen minutes per hour ("the fifteen-minute restriction"). See id. at ¶ 57. Buck disagreed with this accommodation. See Buck Dep. Tr. ("Buck Tr."), Ex. 1 to Def.'s Mem., at 136:3-16. The IDSC explored whether there were any devices that would allow Buck to perform the essential functions of the SSM position, such as magnification or voice recognition software. See id. at ¶¶ 58-59. Dr. Parke called Dr. Soloway's office to discuss potential accommodations, but was unable to connect with Dr. Soloway. See id. at ¶¶ 60-61.

Carla Putnam, an associate director of job accommodations at AT&T, asked Buck if he had any recommendations with respect to the proposed accommodations, and Buck said he did not have any. See L.R. 56(a)(1) Stmt. at ¶ 63; Timeline, 9/21/06 Entry, Ex. 2 to Pl.'s Opp. at 7. The fifteen-minute restriction would have shifted many of Buck's responsibilities to other employees in his group and would have imposed an undue burden on that group. See L.R. 56(a)(1) Stmt. at ¶ 66-67. Buck could not perform the necessary computer tasks for the SSM job, even with the fifteen-minute restriction. See id. at ¶¶ 69-70.

In May 2007, the Connecticut Bureau of Rehabilitative Services ("BRS") conducted a site assessment to analyze whether there were any possible accommodations for Buck in the SSM position, and BRS concluded that there was no available technology that would enable Buck to perform the work necessary for the job. See id. at ¶¶ 71-72. Buck and the BRS determined that the SSM was inappropriate for

him because of his disability.  See id. at ¶¶ 73-74.  Between June/July and October 2006, Buck worked in a temporary work program at AT&T.  See Buck Tr. at 130:16-131:18.  While in the temporary work program, Buck was paid his full salary as an SSM.  See L.R. 56(a)(1) Stmt. at ¶ 76.

In October 2006, after AT&T determined that Buck could not reasonably perform the SSM position, they transitioned him to short-term disability and into an assisted job search.  See id. at ¶ 79-80.  If Buck could not find a position with AT&T within a year, he would be terminated.  See id. at ¶ 81.  Buck was paid 100% of his SSM salary between October 2006 and July 2007, and 60% of his salary between July and September 2007.  See id. at ¶¶ 83-84.

During his job search, Buck worked with Joan Filibert and Barbara Barrett.  See id. at ¶ 86.  Filibert and Barrett told Buck that, if he disagreed with the fifteen-minute restriction, he could ask Dr. Soloway for clarification.  See id. at ¶ 90.  Dr. Soloway submitted monthly reports to AT&T, but never clarified Buck's visual capabilities such that he could return to the SSM position.  See id. at ¶¶ 92-93.  On May 9, 2007, Dr. Soloway wrote in his report, "because of fatigue, intermittent blurred vision it is difficult to put a time constraint on how long he can work hour wise without taking breaks, especially doing computer and fine work.  He is certainly capable of this but with the limitation that . . . he will have to take breaks periodically to rest the eye . . . ."  Dr. Soloway Letter of 5/9/07, Ex. M to Def.'s Mem.  The IDSC inferred that Dr. Soloway's letter meant that Buck could work if he took a five-minute break every hour, but Buck disagreed with this assessment and stated that he could not perform the SSM position.  See id. at ¶¶ 97-99.

Buck applied for eighty-one positions within AT&T during his job search. See id. at ¶ 85. Of these positions, at least forty-one were "Level 1" positions, which were eligible for an eleven percent bonus. See id. at ¶¶ 103-04. Buck has admitted that he has no evidence that his disability was the reason that he was not hired for any of the positions to which he applied. See id. at ¶¶ 108, 111, 113, 118, 120, 122, 126. However, Buck asserts that Filibert told him that a staffing specialist would discuss his accommodations with any potential hiring managers. See L.R. 56(a)(2) Stmt. at ¶ 116.

In July 2007, Cyndy Comstock, who was reviewing openings for Buck in the Resource Pool, informed Barrett that a Senior Communication Specialist ("SCS") position was open in a different AT&T organization and that the position appeared to be similar to the NTM position. See L.R. 56(a)(1) Stmt. at ¶¶ 133-34. The SCS position was temporary, but Barrett explored ways to convert it into a permanent position. See id. at ¶¶ 135-36. To convert it to a permanent position, Buck's old group would lose a position, but Barrett agreed to this arrangement, and the SCS position was converted into a permanent position. See id. at ¶¶ 137-40.

Buck accepted the SCS position and began work on September 24, 2007. See id. at ¶¶ 141-42. As an SCS, Buck's salary is $87,094. See Pay Stub of 1/21/10, Ex. 6 to L.R. 56(a)(2) Stmt. Buck was given a larger 17" computer monitor and a "sit/stand" work station as an SCS. See L.R. 56(a)(2) Stmt. at ¶ 146. As an SCS, Buck is a Level 1 employee and is eligible for a ten percent annual bonus. See L.R. 56(a)(1) Stmt. at ¶ 149.

### III.   DISCUSSION

Buck claims that AT&T violated the Americans with Disabilities Act ("ADA"), a

7

federal statute that provides, inter alia, that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009). Under such a burden-shifting analysis, "[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason" for the challenged employment action; and the plaintiff must then "produce evidence and carry the burden of persuasion that the proffered reason is a pretext." Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006). In his Amended Complaint and in his Opposition to AT&T's Motion for Summary Judgment, Buck appears to suggest four ways in which AT&T discriminated against him. The court will address each in turn.

### A.   Failure to Be Chosen for NTM Position

In his Amended Complaint, Buck alleges that the three individuals given the NTM jobs that remained in the United States had less seniority than he did. See Am. Comp. at ¶ 10. In making this allegation, Buck appears to make a claim that he was not given one of these three NTM positions because of his disability. Id. at ¶¶ 13, 16. However, in his opposition to the summary judgment motion, Buck does not address this claim nor does he respond to AT&T's arguments about this claim.

"'Federal courts may deem a claim abandoned when a party moves for summary

judgment on one ground and the party opposing summary judgment fails to address the argument in any way.'" Coger v. Connecticut, 309 F. Supp. 2d 274, 280 (D. Conn. 2004) (quoting Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)); see also Lami v. Stahl, 2007 U.S. Dist. LEXIS 79094, at *3 (D. Conn. Oct. 25, 2007) ("It is well settled that a failure to brief an issue is grounds to deem the claim abandoned."). In his Opposition, Buck specifically laid out the ways he alleges AT&T discriminated against him on the basis of his disability, but he does not include the claim that he was not hired for the NTM position because of his disability. See Pl.'s Opp. at 4-5 (Doc. No. 50). Therefore, this court will consider that claim, to the extent that Buck made it in his Amended Complaint, to be abandoned. The court grants summary judgment to AT&T on the claim that Buck was not chosen for one of the NTM positions because of his disability.

B.   Accommodations for the SSM Position

AT&T argues that Buck cannot make out a prima facie case that he was not reasonably accommodated while he was in the SSM position. See Def.'s Mem. at 20-21. A prima facie case of disability discrimination for failure to accommodate requires a showing that (1) Buck is a person with a disability under the meaning of the ADA; (2) that AT&T is covered by ADA and had notice of his disability; (3) with reasonable accommodation, he could perform the essential functions of his job; and (4) AT&T refused to make such accommodations. See McBride, 583 F.3d at 96-97. The first two elements of this test are not disputed. See Def.'s Mem. at 19 n.7.

"The plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment . . . ." McBride, 583 at 97. Buck has admitted that he

9

could not perform the essential functions of the SSM position and that there was no accommodation which would enable Buck to remain in the SSM position. See L.R. 56(a)(2) Stmt. at ¶¶ 38, 64. Therefore, Buck does not satisfy the third prong of the prima facie case, and AT&T is entitled to summary judgment on this claim.

Buck failed to address this point in his Opposition, instead arguing that AT&T "imposed a broad medical restriction on his ability to work . . . without any type of hands-on testing in the workplace or a personal medical examination by a company physician." See Pl.'s Opp. at 4-5. However, "[t]he ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." Jackan v. N.Y. State Dep't of Labor, 205 F.3d 562, 566 (2d Cir. 2000). In contrast to the allegations he makes in his Opposition, Buck has admitted that AT&T referred him to their own physician for an evaluation, that he met with a job accommodation director, and that the Connecticut Bureau of Rehabilitation Services conducted an on-site assessment of his work as an SSM. See L.R. 56(a)(2) Stmt. at ¶¶ 56, 62, 71-72.

> "Liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown. But where . . . the employer does not obstruct the process, but instead makes reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed, ADA liability simply does not follow."

Economou v. Caldera, 2000 U.S. Dist. LEXIS 18231, at *83-84 (S.D.N.Y. Dec. 18, 2000) (quoting Beck v. Univ. of Wisc. Bd. of Regents, 75 F.3d 1130, 1137 (7th Cir. 1996)). In this case, no reasonable jury could find that AT&T obstructed the interactive process. Instead, the record demonstrates that AT&T made reasonable efforts to work together with Buck: AT&T attempted to contact Buck's personal physician to clarify

possible accommodations; informed Buck that his physician could send documents clarifying his disability; had a company physician evaluate Buck and set forth a possible accommodation; had a job accommodations specialist meet with Buck on more than one occasion; and provided access for the Connecticut Bureau of Rehabilitative Services to perform an on-site assessment.  Buck, on the other hand, has admitted that Dr. Soloway never clarified his disability such that he could return to the SSM position. See L.R. 56(a)(2) Stmt. at ¶¶ 92-93.  Therefore, if anyone caused a breakdown in the interactive process, it was Buck, and liability should not attach to AT&T.

Additionally, even if there was sufficient evidence of this for a jury to find that AT&T was responsible for the breakdown of the interactive process, it cannot be liable because Buck has admitted that there was no possible accommodation that would have allowed Buck to perform his job.  "[F]ailure to engage in an interactive process does not form the basis of an ADA claim in the absence of evidence that accommodation was possible." See McBride, 583 F.3d at 100.  Therefore, the court grants summary judgment in favor of AT&T on the claim that AT&T failed to reasonably accommodate Buck in the SSM position.

C.    Transfer to the Resource Pool

In his Opposition to the AT&T's Summary Judgment Motion, Buck argues that the AT&T discriminated against him by "exclud[ing] him from a transfer to the Resource Pool in August 2006, along with the rest of his co-workers in the IT department who had not been able to identify a new position although it was clear that he could not perform his new job as a Senior Systems Manager." Pl.'s Opp. at 4.  Buck did not raise this claim of discrimination in his Complaint.  See Am. Compl.  Although the Second Circuit

11

has not addressed "whether a plaintiff may assert a new claim in response to a defendant's motion for summary judgment, such a practice is disfavored in other jurisdictions." Livingston v. Bev-Pak, Inc., 112 F. Supp. 2d 242, 248 n.3 (S.D.N.Y. 2000) (citing Schaffer v. A.O. Smith Harvestore Prods., Inc., 74 F.3d 722, 731 (6th Cir. 1996; Evans v. McDonald's Corp., 936 F.2d 1087, 1090-91 (10th Cir. 1991); Fisher v. Metro. Life Ins. Co., 895 F.2d 1073, 1078 (5th Cir. 1990)).  However, assuming arguendo that Buck is referring to the Resource Pool when he alleges in his Amended Complaint that, of those employees whose jobs were outsourced, "all were given other jobs except for the plaintiff," the court will address this claim. See Am. Comp. at ¶ 10.

Buck argues that, for the purposes of his reasonable accommodations discrimination claim, the "job" in question should be a "transfer to the Resource Pool." Pl.'s Opp. at 12. Buck argues that he "should have been given the same options during his job search that other employees in the IT department were given from April 2006 through August 2006." Id. at 13.

"[I]t is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." See Graves v. Finch Pruyn & Co., 457 F.3d 181, 184 (2d Cir. 2006) (quoting 29 C.F.R. pt. 1630, app. at 363 (2003)). Buck argues that he "discussed and requested a transfer to the Resource Pool in July 2006 with Elaine Arnotti, and repeated the request during the course of his prolonged job search." See Pl.'s Opp. at 17. However, Buck does not cite to any evidence that supports this assertion. Buck first cites to paragraph 11 of AT&T's 56(a)(1) Statement, but it appears

to the court that Buck intended to refer to paragraph 12,[4] in which AT&T states that, "AT&T told Buck and his colleagues that they would be permitted to search for a new position within the IT organization within the IT organization but that if they were unable to find a suitable position they would be placed into a Resource Pool." L.R. 56(a)(1) Stmt. at ¶ 12. Buck admitted this statement. See L.R. 56(a)(2) Stmt. at ¶ 12. However, nothing in this statement provides the court with any evidence that Buck requested a transfer to the Resource Pool. In fact, it makes it clear that the Resource Pool was a alternative for employees who did not find another position. Buck accepted the SSM position and began working in June 2006, which is why he was not transitioned to the Resource Pool. See L.R. 56(a)(1) Stmt. at ¶ 30. The Resource Pool was for those employees who had not found a new position, a group which did not include Buck.

On this same point, Buck also cites to his own notes, which record a timeline of his interactions with various AT&T personnel during the period in dispute. See Timeline, Ex. 2 to Pl.'s Opp. Much of this document is inadmissible hearsay; however, the court will reference the portions of this document Buck cites to in this instance because, even if they were admissible, they do not provide evidence that Buck requested a transfer to the Resource Pool. The first citation is to a purported conversation on June 22, 2006, with Elaine Arnotti, in which Arnotti allegedly stated, "They would need to figure out where to put me, back to my original job or to the resource pool. . . . [John Szanyi] thought it would be best for me to go to the resource

---

[4] Paragraph 11 states that, "AT&T informed the NTMs that none of them would be laid off or would lose their jobs." L.R. 65(a)(1) Stmt. at ¶ 11.

pool because that is where I would go if I did not obtain another position by 08/01/06." Timeline, 6/22/06 Entry, Ex. 2 to Pl.'s Opp. at 7. Buck also cites to a December 13, 2006, conversation with Joan Filibert, in which "Joan explained she met with Cathy Comstock (Resource Pool) and Carla Putnam (Accommodations Specialist) and they were made aware of my situation and would be considered in the process. Joan explained that Cathy Comstock thought that all the jobs available would not be in line with my restriction." Id., 12/13/06 Entry, at 21. These are the only citations noted in Buck's Opposition that even reference the Resource Pool. Even if this evidence was admissible, it does not provide any support for the allegation that Buck requested a transfer to the Resource Pool, as he is required to do. At most, this evidence demonstrates that AT&T was considering at one point placing Buck in the Resource Pool. However, it is the plaintiff's burden to request an accommodation, and the fact that AT&T was considering such an accommodation does not mean that Buck has satisfied his burden. See Graves, 457 F.3d at 184.

Buck also stated in his interrogatory responses that his "only request for accommodation was made to AT&T Human Resources Representative, Elaine Arnotti, on July 5, 2006." Interrogatories, Answer 17, Ex. 3 to Pl.'s Opp. at 11. Buck's notes from that date do not include any reference to a request to transfer to the Resource Pool. See Timeline, 7/5/06 Entry, Ex. 2 to Pl.'s Opp. at 9.[5] Based on the record before the court, no reasonable jury could find that Buck had requested a transfer to the Resource Pool. Because Buck did not request as an accommodation that AT&T

---

[5] AT&T has offered portions of Buck's timeline into evidence as admissions of a party opponent; therefore the portions of his timeline that include his own statements are not hearsay. See Def.'s Mem. at 7 n.1.

14

transfer him to the Resource Pool, AT&T had no opportunity to deny the accommodation. "An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation." Graves, 457 F.3d at 184-85 (citation omitted). Buck has not made out a prima facie case of reasonable accommodation discrimination. Thus, summary judgment is granted on the claim that AT&T failed to accommodate him by not transferring him to the Resource Pool.

D.   Failure to Hire Buck

Buck alleges in his Amended Complaint that he was passed over for the jobs that he applied for during his internal job search "because of his disability." Am. Compl. at ¶ 11. Buck also stated that "prospective managers who considered my job application during my job search in 2006 and 2007 were aware that I was out on short term disability, and I believe this created an additional obstacle for me to overcome in order to locate a suitable position within the company." Aff. of John Buck, Ex. 1 to Pl.'s Opp. at ¶ 18.

To establish a prima facie case of disability discrimination, Buck must show that "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001). Once a plaintiff has made out a prima facie case, the burden shifts to the defendant to show it had a legitimate non-discriminatory reason for the challenged action. See Sista, 445 F.3d at 169. Once the employer has done so,

> the burden shifts back to the plaintiff to produce adequate evidence to support a rational finding that the employer's explanation is false and that, more likely than not, discrimination was the real reason for the adverse action. Mere speculation is insufficient; a plaintiff must offer specific, admissible evidence of pretext.

Fall v. N.Y. State United Teachers, 289 Fed. App'x 419, 421 (2d Cir. 2008) (citation omitted).

Assuming without deciding that Buck has made out a satisfactory prima facie case, AT&T has provided the court with legitimate reasons for not selecting Buck for several of the positions he applied for. See L.R. 56(a)(1) Stmt. at ¶¶ 107-29. For example, Buck was not hired as a Senior Account Manager because Buck did not have the background and career experience, and he was not hired as a Retail Manager because the hiring manager was looking for someone with retail sales experience, which Buck did not have. See id. at ¶¶ 117, 119. Natalie Hunter, a senior staffing manager who coordinated Buck's job applications, stated that Buck was not selected for positions because he lacked one of the required skills or because a more qualified candidate applied. See id. at ¶¶ 127-29.

Buck has admitted that he has no evidence that he was not hired for any of the positions he applied for because of his disability. See L.R. 56(a)(2) Stmt. at ¶¶ 108, 111, 113, 118, 120, 122, 126. However, Buck claims that he was told that a staffing specialist would discuss his accommodations with potential hiring managers. See L.R. 56(a)(2) Stmt. at ¶ 116. Buck argues that AT&T "required him to search for new positions on Career Path while he was identified as an employee who was out on disability; this put him at a significant disadvantage with other active employees who were posting for the Career Path openings." See Pl.'s Opp. at 5. Buck argues that

16

AT&T's procedure "effectively blacklisted him with new potential managers by signaling that he was not qualified for any position in the company because of his disability." Id. However, the mere fact that hiring managers were aware of his need for potential accommodations does not raise a genuine issue of material fact as to whether AT&T's stated reasons for failing to hire Buck are mere pretext for discrimination. In the absence of additional evidence, Buck's assertions are "[m]ere speculation." Fall, 289 Fed. App'x at 421.

Buck also alleges, without support, that AT&T's "delay in locating a position for the plaintiff within the organization for fifteen months is circumstantial evidence of an intent to discriminate against him." Pl.'s Opp. at 16. However, Buck has admitted that, during the time he was on disability, he spoke regularly with AT&T representatives who were working with him to find him a new position at the company. See L.R. 56(a)(2) Stmt. at ¶ 86. Additionally, Buck has admitted that his current position with AT&T was created specifically for him from a temporary position, at some disadvantage to AT&T. See id. at ¶¶ 135-40. Based on the record before this court, no reasonable jury could find that the delay in finding a job for Buck was due to AT&T's discrimination. Buck has not provided the court with anything more than speculation as to AT&T's possible pretext. Therefore, the court grants summary judgment in favor of AT&T as to Buck's claims that he was passed over for jobs during his time on leave because of his disability.

## V.  CONCLUSION

For the reasons stated herein, AT&T's Motion for Summary Judgment (Doc. No. 38) is granted. Judgment shall enter for the defendant, and the Clerk is directed to

close the case.

**SO ORDERED**.

Dated this 25th day of June, 2010, at Bridgeport, Connecticut.

    /s/ Janet C. Hall
Janet C. Hall
United States District Judge